AO 91
Rev. 11/82

# CRIMINAL COMPLAINT

| United States District Court | DISTRICT CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA V. BRIAN BRIM aka Bryan Brim, JEFFREY RENCHER and FLOYD DAVERLIN OSBORNE | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO. 93- **93-1663M** |

| Complaint for violation of Title 21 | United States Code § 841(a)(1) & 846 |
|---|---|

| NAME OF JUDGE OR MAGISTRATE JOSEPH REICHMANN | OFFICIAL TITLE United States Magistrate | LOCATION Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE 7/24/93 | PLACE OF OFFENSE Riverside County | ADDRESS OF ACCUSED (if known) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

On or about July 24, 1993, in Riverside County, within the Central District of California, defendants BRIAN BRIM, aka Bryan Brim, JEFFREY RENCHER and FLOYD OSBORNE knowingly and intentionally conspired and agreed with each other to manufacture phencyclidine (PCP), a Schedule III controlled substance.

In furtherance of the conspiracy, defendants delivered chemicals to be used to manufacture PCP to a residence at 16760 Multiview Drive in Perris, California.

JUL 26 1993

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

**(See attached affidavit which is incorporated as part of this Complaint)**

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT (official title) WILLIAM JACKSON |
|---|---|
| | OFFICIAL TITLE Special Agent - DEA |

| Sworn to before me and subscribed in my presence, SIGNATURE OF MAGISTRATE(S) | ENTERED ON ICMS | DATE July 26, 1993 |
|---|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

EBM:dem   REC: DETENTION (for each defendant)   (Warrant - for 1st defendant)

## AFFIDAVIT OF WILLIAM JACKSON

I, William Jackson, hereby swear as follows;

### INTRODUCTION

1. I am a Task Force Agent ("TFA"), currently assigned to the Southern California Drug Task Force. I have been assigned to the Southern California Drug Task Force since December of 1992.

2. Prior to this, I was a police officer with the City of Compton, California, Police Department. I have been employed as a police officer with the Compton Police Department for approximately eight years. In the course of my duties as a police officer, I have conducted more than one hundred narcotics investigations, and I have participated in the arrest of more than one hundred individuals for violation of narcotics law. I have interviewed narcotics users, narcotic sellers, narcotics experts and narcotics informants, and have discussed with them common methods of use, packaging, manufacture, sale and transportation of narcotics. I have also attended an eighty hour clandestine laboratory safety school. Through my training and experience, I have become familiar with the chemicals and precursors and laboratory apparatuses used to manufacture phencyclidine ("PCP"). Additionally, I have become familiar with the packaging and methods by which chemicals and equipment used to manufacture PCP are purchased by individuals intending to manufacture controlled substances.

3. This affidavit is made in support of complaints charging FLOYD DAVERLIN OSBORNE and JEFFREY RENCHER with violation of 21

U.S.C. §§ 846 and 841(a)(1), conspiracy to manufacture Phencyclidine ("PCP"), a Schedule III controlled substance. This affidavit is also made in support of a complaint and arrest warrant charging BRIAN KEITH BRIM with violation of 21 U.S.C. §§ 846 and 841(a)(1).

## PROBABLE CAUSE

4. I am aware, based on my training and experience, that a chemical called Ethyl Ether is used in the manufacture of PCP. Ethyl Ether is defined as a "listed essential chemical" under 21 U.S.C. § 802(35)(D). I am aware of no legitimate use for Ethyl Ether, other than as a rocket fuel or to power racing cars or, in limited quantities, as starting fluid.

5. I am also aware that pure Ether, or Ether ACS, is used for the same purpose in the manufacture of PCP as Ethyl Ether.

6. I am aware that a chemical called Bromobenzene is a precursor that is used in the manufacture of PCP.

7. I am aware that J.B. Chemical is a chemical supply company located in North Las Vegas, Nevada.

8. I have received numerous reports from an employee of J.B. Chemical regarding an individual named BRIAN KEITH BRIM, who has bought large amounts of Ether and Bromobenzene, including the following:

a. On January 26, 1993, BRIM purchased 4 5-gallon containers of Ether ACS.

b. On the same day, January 26, 1993, BRIM purchased 1-liter of Bromo benzene.

2

c. On May 28, 1993, BRIM purchased 14 5-gallon containers of Ether ACS. He paid $2,899.70 cents cash for this chemical. According to the employee, BRIM used a "U-Haul" trailer to pick up the chemicals.

9. According to the employee of J.B. Chemical, BRIM gave a Carson, California, address during these purchases of chemicals.

10. Also according to the employee at J.B. Chemical, on Thursday, July 15, 1993, BRIM placed an order for 70 gallons of Ethyl Ether. BRIM paid a $1,000 cash deposit for this chemical. The Ethyl Ether had to be specially ordered because of the large amount of chemical involved. According to the employee, BRIM arranged to pick up the 70 gallons of Ethyl Ether on July 21, 1993.

11. On or about July 12, 1993, I was contacted by DEA SA Steve Tomaski. According to SA Tomaski, who works at the Los Angeles International Airport (LAX) Group, he had at sometime within the past week, interviewed two men who were arriving at LAX from Chicago, Illinois. The two men ("CI-1 and CI-2") had $12,000 in cash, and a suitcase with coffee grounds sprinkled inside it. (I am aware because of my training and experience that drug couriers, including PCP couriers, use substances that have powerful odors, such as coffee, to mask the smell of the drugs that they are carrying).

12. According to SA Tomaski, CI-1 was interviewed, and agreed to make a statement. CI-1 said that he worked for BRIAN BRIM, transporting PCP. CI-1 said that he and CI-2 had just

3

gotten back from a "trip." When asked about the $12,000, CI-1 said that $6,000 of it belonged to he and CI-2, and the other $6,000 was to be delivered along with the suitcase to a female in Watts, California.

13. CI-1 also said that he expected to make another trip for BRIM sometime within two weeks. CI-1 said that he expected to transport another 10 gallons of PCP to Washington D.C.

14. According to the CLETS, which is a data base on which criminal records are maintained, BRIAN BRIM has an extensive criminal record. Among his numerous arrests and convictions are the following:

a. A November 1, 1982, felony conviction for possession of Phencyclidine (PCP) for sale, in violation of Cal. Health and Safety Code Section 11378.5.

b. A February 6, 1989, felony conviction for possession or purchase for sale of a controlled substance, in violation of Cal. Health and Safety Code section 11351.

c. On November 28, 1979, BRIM was arrested for assault with intent to murder. He was later exonerated.

d. On December 29, 1981, BRIM was arrested for murder. He was acquitted at trial.

e. On February 28, 1988, BRIM was arrested for murder. He was later exonerated.

15. On July 21, 1993, at approximately 12:45 p.m., I was informed that the employee of J.B. Chemical had received a telephone call from BRIM. BRIM said that he was in Reno and

4

would not be able to pick up the chemicals that day, but that he would be at J.B. Chemical the following day, at about 10:00 a.m.

16. On July 22, 1993, at about 10:30 a.m., I was conducting surveillance at J.B. Chemical. I observed BRIM (whom I recognized from a photograph) and a female passenger arrive in a maroon van, California license plate No. 2ZRN220. BRIM went into J.B. Chemical to conduct business. Numerous drums of chemicals were loaded into the maroon van, which then left the location.

17. Afterward, I spoke to the employee of J.B. Chemical. He informed me that he had sold BRIM 70 gallons of Ethyl Ether, which was loaded in the maroon van. The employee also informed me that BRIM requested and received a case of banana air freshener.

18. According to California Department of Motor Vehicle records, the registered owner of the maroon van is BRYANT K. BRIM. The VIN of this vehicle is JM3LV5222N0424059.

19. I with other surveillance agents, surveilled the maroon van to a 16760 Multiview Drive, Perris, California (the Multiview residence). I recognized BRIM as the driver of the van. An unidentified woman was a passenger in the van.

20. The maroon van pulled into the garage of the Multiview residence, and the garage door was closed behind the maroon van. After about one hour, BRIM and the unidentified woman left the Multiview residence in the van.

21. I and other agents remained in surveillance on the Multiview residence. At 12:30 p.m. on July 24, 1993, I observed

5

a dark blue Chrysler van arrive at the Multiview residence. The van was occupied by a single male black, later identified as FLOYD DAVERLIN OSBORNE. Approximately five minutes later, the maroon van arrived at the location, occupied by BRIM and another man later identified as JEFFREY RENCHER.

22. OOSBORNE BRIM, and RENCHER talked for a period of time. RENCHER then opened up a small door to the garage of the Multiview residence. At the same time, BRIM opened the rear door of the maroon van. RENCHER then walked into the garage and pulled the door most of the way shut behind him. BRIM then carried a blue five-gallon container into the garage, as RENCHER stood at the door to the garage. Based on my training and experience, I believe the container to have contained petroleum ether. BRIM and RENCHER then repeated the process with another identical container. The three men then got into dark blue GMC van that was parked on the property, and left the location.

23. BRIM, RENCHER, and OSBORNE returned together to the multiview residence at approximately 3:00 p.m. that day. I and other agents were continuing to conduct surveillance. The three men went inside the house. Shortly afterwards, the three men left the house and went into the barn on the property. They returned to the house, and went inside.

24. Approximately ten minutes later, one of the men came outside the house, and began smoking a cigarette. He was later joined by the other two men. I am aware that many of the substances used in the manufacture of PCP, especially ethyl

6

ether, are extremely flammable, making it prudent to smoke cigarettes outside the laboratory. All three men went back into the residence after the first man finished his cigarette.

25. Some time later, RENCHER and BRIM got into the maroon van, and left the location. OSBORNE got into the blue Chrysler van, and backed up to the side entry door to the garage. OSBORNE unlocked the side door of the garage, and removed two large bundles that were white in color and wrapped in grey masking tape, and, walking very quickly, carried the bundles into the garage. He closed the garage door behind him. OSBORNE exited the garage, closing the door behind him. He took two boxes from the van into the garage, and carried two large boxes from the van to the garage.

26. On numerous occasions I have observed kilograms of cocaine. The bundles that OSBORNE carried from the blue Chrysler van into the garage were similar in size, wrapping and appearance to kilograms of cocaine that I have seen in the past.

27. OSBORNE returned to the blue Chrysler van, and carried two blue five gallon containers into the garage. The containers were sealed, and had a white chemical label on them. I was not close enough to the containers to read the chemical notations on the label. Each time OSBORNE entered or left the garage, he pulled the door almost closed so that one could not see into the garage.

28. OSBORNE then locked up the garage door, and departed the location.

7

29. SA Brenden D'Arcandelo and I walked up to the fence line of the premises. We both were able to detect a strong odor of banana in the air. We were able to hear motors, similar to the sound of a fan, coming from the garage.

30. In my training and experience, when PCP is manufactured, several chemicals are combined in a bucket. A ten to twelve hour period is required for the chemical reaction to take place. Then other chemicals are added to the mix, and an additional waiting period is required before finished PCP is manufactured.

31. This chemical process gives off strong odors. I believe that the motor I heard was a fan, used to dissipate the chemical vapors. I believe that the banana smell that I detected was from the banana freshener that BRIM had purchased at J.B. Chemical. It is common for persons engaged in the manufacture of PCP to use a device of this type to mask the powerful smell of the chemical reactions taking place in the laboratory, to avoid detection.

32. On July 24, 1993, the Honorable Robert Stone, United States Magistrate Judge issued a warrant to search the Multiview residence. A copy of that warrant is attached hereto as Exhibit A.

33. On July 25, 1993, SA Tom Gorshe and other agents were surveilling the Multiview residence prior to executing the search warrant. SA Gorshe told me the following:

8

a. He saw two men, later identified as RENCHER and BRIM drive up to the residence in a 1978 Ford.

b. He saw another man, later identified as OSBORNE walking in the yard of the residence.

c. He and other agents then arrested the three men. The driver of the Ford identified himself as JEFFREY RENCHER and was carrying a California I.D. card in that name. The passenger identified himself as Charles Graham. The man walking in the yard identified himself as Floyd OSBORNE and was carrying a California drivers license in that name.

34. SA Michael Sader of DEA told me the following:

a. He was present at the Multiview residence when OSBORNE and RENCHER were arrested.

b. Shortly after RENCHER and OSBORNE were arrested, SA Sader saw a maroon van driving by in front of the residence. SA Sader recognized the van as being the same van occupied by Brian BRIM the day before.

c. SA Sader began to follow BRIM in his car to coordinate a traffic stop with the California Highway patrol. BRIM began to drive erratically and in a manner I recognized as being designed to avoid apprehension. SA Sader and other agents continued to pursue BRIM. The pursuit turned into a high-speed chase lasting approximately twenty-five minutes reaching speeds of approximately 100 to 110 miles per hour. During the chase, BRIM several times attempted to collide with agent's vehicles.

9

In one instance, he successfully crashed into one of the agents's vehicles. BRIM eventually eluded pursuit and escaped.

35. I arrived at the Multiview residence shortly after the men were arrested. I recognized OSBORNE and RENCHER as the men I had seen at the residence the day before.

36. I and other agents then executed the search warrant and conducted a search of the location.

37. I and other agents executed the search warrant early on the morning of July 25, 1993. The following items were found inside the garage of the residence:

a. On the right side of the garage there were eight five gallon white buckets, covered with pieces of cloth. The buckets contained a dark sludge-like liquid, 1/2 to 1/3 full. The contents smelled like Piperidine. Piperidine is a precursor chemical for PCP.

b. Lined up next to the above-mentioned buckets were another eight five gallon buckets containing a dark red crystal, 1/2 to 1/3 full. These contents of the buckets were covered by pieces of cloth which absorbed excess liquid.

c. In the remainder of the garage were found the following:

(1) One box containing three one-pound bottles of Iodine crystals.

(2) Two one gallon plastic bottles labeled hydrochloric acid.

10

(3)   Six one gallon plastic bottles labelled

ammonia.

(4)   Six one gallon plastic bottles of yellow

liquid.

(5)   Five gray five gallon metal cans of ether.

(6)   One fifty-five gallon barrel of Nalgene.

(7)   Four five gallon containers of petroleum

ether.

(8)   Two gray five gallon containers with no

labels.

(9)   One digital scale.

(10)   One gallon-size gasoline container wrapped
in a disposable diaper with gray masking tape.

38.   The containers of petroleum ether appeared to be the
same containers I had seen carried into the garage the day
before.

39.   On July 26, 1993, I spoke to SA Daryl Evans of DEA who
told me the following:

a.   Following his arrest, he advised RENCHER of his
constitutional rights, which he waived.

b.   RENCHER told SA Evans that he had gone to the
Multiview residence at the time of his arrest to attend a party
and that he had never been to the house before.

c.   On July 25, 1993, SA Evans spoke to a neighbor of
the Multiview residence who did not wish to be identified.   SA
Evans showed the neighbor photographs of RENCHER and OSBORNE.

11

The neighbor identified RENCHER as having been at the house on prior occasions.

40. Based on these above facts, I believe that the Multiview residence is being used to manufacture PCP, that the garage contained an operating PCP laboratory, and that BRIM, OSBORNE, and RENCHER conspired together to manufacture PCP.

I swear under penalty of perjury that the foregoing is true and correct.

_____
WILLIAM JACKSON
Southern California Drug
Task Force.

Subscribed and sworn to before me

on this _____ day of July, 1993.

_____
UNITED STATES MAGISTRATE JUDGE

12

# SEARCH WARRANT ON WRITTEN AFFIDAVIT

## United States District Court

DISTRICT
CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA.

v.

| | DOCKET NO. | MAGISTRATE CASE NO. |
|---|---|---|

TO:
WILLIAM JACKSON, or any other qualified law enforcement official

The Premises known as 16760 Multiview Dr.
Perris, California

Affidavit(s) having been made before me by the below-named affiant that he/she has reason to believe that on the premises known as

SEE ATTACHMENT A

in the **CENTRAL** District of **CALIFORNIA**

there is now being concealed certain property, namely:

SEE ATTACHMENT B

and as I am satisfied that there is probable cause to believe that the property so described is being concealed on the person or premises above-described and the grounds for application for issuance of the search warrant exist as stated in the supporting affidavit(s),

YOU ARE HEREBY COMMANDED to search on or before ___ten (10) days___
(not to exceed 10 days) the person or place named above for the property specified, serving this warrant and making the search (in the daytime — 6:00 A.M. to 10:00 P.M.) (at any time in the day or night)* and if the property be found there to seize it, leaving a copy of this warrant and receipt for the property taken, and prepare a written inventory of the property seized and promptly return this warrant to ___the duty U.S. Magistrate___
as required by law.                                           *U.S. Judge or Magistrate*

| NAME OF AFFIANT | SIGNATURE OF JUDGE OR US MAGISTRATE | DATE/TIME ISSUED |
|---|---|---|
| WILLIAM JACKSON | | |

*If a search is to be authorized "at any time in the day or night" pursuant to Federal Rules of Criminal Procedure Rule 41(c), show reasonable cause therefor.

**United States Judge or Judge of a State Court of Record.

ATTACHMENT A

The premises to be searched is 16760 Multiview Drive, Perris,
California.  This premises is further described as follows:

The premises contains a single story, single family
residence, with an attached garage.  The exterior of
the residence is grey stucco, with blue trim.  The
residence has a wooden entry door, which faces south.
The attached garage extends closer to the sidewalk
than the front door.  All the windows in the residence
are equipped with roll-down metal security gates.
There is a barn located on the premises, which is
north-west of the residence.  There is also a brick
wall which extends from the east property line to the
west property line, fronting on Multiview Drive.
There is a wrought iron gate where the driveway of the
residence intersects the brick wall.  There is a
locked U-Haul trailer parked on the premisis.

Permission is sought to search the residence
itself, all rooms within the residence, the attached
garage, the barn, the U-Haul trailer, any other
structures on the premises, any vehicles located on
the premises, and the grounds within the curtilage of
the premises.

ATTACHMENT B

Permission is sought to search for and seize the following objects:

a.  Documents showing ownership of the property searched.

b.  United States Currency.

c.  Books, records, receipts, notes and other papers relating to the manufacture, distribution and sale of PCP, even though these documents may be in code.

d.  Contraband, proceeds of drug sales, records of drug transactions, drug sources, chemical sources, drug customers, and other tangible items evidencing the obtaining, secreting, transfer and/or concealment of assets and/or money obtained through or used in the manufacture, distribution and sale of PCP.

e.  Addresses or telephone numbers in books or papers, which reflect names, address and telephone numbers of their associates in the drug business.

f.  Paraphernalia for manufacturing, distributing, packaging, and weighing of narcotics.

g.  Scientific manuals, chemistry manuals, documents that describe how to manufacture PCP, chemical formulas, laboratory receipts, and notebooks.

h.  Weapons, firearms and knives.

i.  Keys that fit locks, wallets, purses, diaries and luggage tags.

2

   j. Articles of personal property tending to establish the ownership of the property in question, including telephone bills, rent receipts, keys, utility company receipts, papers, documents, letters and canceled mail envelopes.

   k. PCP, chemicals used in the manufacture of PCP, and equipment used in the manufacture of PCP.

3

## AFFIDAVIT OF WILLIAM JACKSON

I, William Jackson, hereby swear as follows;

### INTRODUCTION

1.    I am a Task Force Agent (TFA), currently assigned to the Southern California Drug Task Force.  I have been assigned to the Southern California Drug Task Force since December of 1992.

2.    Prior to this, I was a police officer with the City of Compton, California, Police Department.  I have been employed as a police officer with the Compton Police Department for approximately eight years.  In the course of my duties as a police officer, I have conducted more than one hundred narcotics investigations, and I have participated in the arrest of more than one hundred individuals for violation of narcotics law.  I have interviewed narcotics users, narcotic sellers, narcotics experts and narcotics informants, and have discussed with them common methods of use, packaging, manufacture, sale and transportation of narcotics.  I have also attended an eighty hour clandestine laboratory safety school.  Through my training and experience, I have become familiar with the chemicals and precursors and laboratory apparatuses used to manufacture phencyclidine (PCP).  Additionally, I have become familiar with the packaging and methods by which chemicals and equipment used to manufacture PCP are purchased by individuals intending to manufacture controlled substances.

### PROPERTY TO BE SEARCHED

4

3.    I make this affidavit in support of a search warrant
on the premises located at 16760 Multiview Drive, Perris,
California. (the Multiview residence). This residence is
further described as follows:

> A single story, single family residence, with an
> attached garage. The exterior of the residence is
> grey stucco, with blue trim. The residence has a
> wooden entry door, which faces south. The attached
> garage extends closer to the sidewalk than the front
> door. All the windows in the residence are equipped
> with roll-down metal security gates. There is a barn
> located on the premises, which is north-west of the
> residence. There is also a brick wall which extends
> from the east property line to the west property line,
> fronting on Multiview Drive. There is a wrought iron
> gate where the driveway of the residence intersects
> the brick wall.

### ITEMS TO BE SEARCHED FOR AND SEIZED

4.    Based upon my training and experience detailed within
the affidavit, coupled with my participation in other
investigations of PCP manufacturing organizations, it is my
opinion that:

> a.    Person involved in the manufacture, distribution and
> sale of PCP oftentimes place assets in names other
> than their own to avoid detection of these assets by
> law enforcement officers.

5

b.    That even though these assets are in other persons'
      names, the.traffickers continue to use those assets
      and exercise dominion and control over them.

c.    That drug traffickers maintain a ready supply of
      United States Currency with which to maintain and
      finance their drug business.

d.    That drug traffickers maintain books, records,
      receipts, notes and other papers relating to the
      manufacture, distribution and sale of PCP, even though
      these documents may be in code.

e.    That it is common for drug traffickers to secrete
      contraband, proceeds of drug sales, records of drug
      transactions, drug sources, chemical sources, drug
      customers, and other tangible items evidencing the
      obtaining, secreting, transfer and/or concealment of
      assets and/or money obtained through or used in the
      manufacture, distribution and sale of PCP.

f.    That the manufacture, distribution and sale of PCP
      requires the cooperation and association of a number
      of persons.  As a result, drug traffickers commonly
      maintain addresses or telephone numbers in books or
      papers, which reflect names, address and telephone
      numbers of their associates in the drug business.
      These records will assist law enforcement in the
      identification of other members of the organization.

6

g. That drug traffickers often take, or cause to be taken, photographs of themselves, their associates, their property and their assets, and that these photographs are maintained in their personal effects.

h. That traffickers usually keep paraphernalia for manufacturing, distributing, packaging, and weighing of narcotics within areas where they exercise dominion and control. These items are maintained regardless of whether the traffickers are in actual possession of narcotics at that time.

i. That traffickers often keep scientific manuals, chemistry manuals, documents that describe how to manufacture PCP, chemical formulas, laboratory receipts, and notebooks.

j. That traffickers often maintain weapons, firearms and knives, which could be used by persons on the premises to protect their cache of narcotics and offensively used against a peace officer serving a warrant.

k. That within any location searched there will be keys that fit locks, wallets, purses, diaries and luggage tags, all of which contain in or upon them some personalization that tends to identify the owners thereof, thus circumstantially identifying the occupants of the premises for the purposes of arrest, identification and prosecution.

7

l. That, within any location searched, articles of personal property tending to establish the ownership of the property in question, including telephone bills, rent receipts, keys, utility company receipts, papers, documents, letters and canceled mail envelopes;

m. That the seizure of these items, despite any lapse of time between the events described and the anticipated search by this search warrant, will provide evidence of the events reported within this affidavit and that the items have and will be used in the commission of felony narcotics crimes.

5. Therefore, permission is sought to search for and seize the above objects, as well as PCP, chemicals used in the manufacture of PCP, and equipment used in the manufacture of PCP.

## PROBABLE CAUSE

6. I am aware, based on my training and experience, that a chemical called Ethyl Ether is used in the manufacture of Phencyclidine ("PCP"). Ethyl Ether is defined as a "listed essential chemical" under 21 U.S.C. § 802(35)(D). I am aware of no legitimate use for Ethyl Ether, other than as a rocket fuel or to power racing cars or, in limited quantities, as starting fluid.

7. I am also aware that pure Ether, or Ether ACS, is used for the same purpose in the manufacture of PCP as Ethyl Ether.

8

8.   I am aware that a chemical called Bromobenzene is a precursor that is used in the manufacture of PCP.

9.   I am aware that J.B. Chemical is a chemical supply company located in North Las Vegas, Nevada.

10.   I have received numerous reports from an employee of J.B. Chemical regarding an individual named Brian Keith Brim, who has been buying large amounts of Ether and Bromobenzene. For instance:

a.   On January 26, 1993, Brim purchased 4 5-gallon containers of Ether ACS.

b.   On the same day, January 26, 1993, Brim purchased 1-liter of Bromo benzene.

c.   On May 28, 1993, Brim purchased 14 5-gallon containers of Ether ACS.  He paid $2,899.70 cents cash for this chemical.  According to the employee, Brim used a "U-Haul" trailer to pick up the chemicals.

11.   According to the employee of J.B. Chemical, Brim gave a Carson, California address during these purchases of chemicals.

12.   Also according to the employee at J.B. Chemical, on Thursday, July 15, 1993, Brim placed an order for 70 gallons of Ethyl Ether.  Brim paid a $1,000 cash deposit for this chemical. The Ethyl Ether had to be specially ordered because of the large amount of chemical involved.  According to the employee, Brim arranged to pick up the 70 gallons of Ethyl Ether on July 21, 1993.

9

13. On or about July 12, 1993, I was contacted by DEA SA Steve Tomaski. According to SA Tomaski, who works at the Los Angeles International Airport (LAX) Group, he had at sometime within the past week, interviewed two men who were arriving at LAX from Chicago, Illinois. The two men ("CI-1 and CI-2") had $12,000 in cash, and a suitcase with coffee grounds sprinkled inside it. (I am aware because of my training and experience that drug couriers, including PCP couriers, use substances that have powerful odors, such as coffee, to mask the smell of the drugs that they are carrying).

14. According to SA Tomaski, CI-1 was interviewed, and agreed to make a statement. CI-1 said that he worked for Brian Brim, transporting PCP. CI-1 said that he and CI-2 had just gotten back from a "trip." When asked about the $12,000, CI-1 said that $6,000 of it belonged to he and CI-2, and the other $6,000 was to be delivered, along with the suitcase to a female in Watts, California.

15. CI-1 also said that he expected to make another trip for Brim sometime within two weeks. CI-1 said that he expected to transport another 10 gallons of PCP to Washington D.C.

16. According to the CLETS, which is a data base on which criminal records are maintained, Brian Brim has an extensive criminal record. Among his numerous arrests and convictions are the following:

10

a.   A November 1, 1982 felony conviction for possession of Phencyclidine (PCP) for sale, in violation of Cal. Health and Safety Code section 11378.5

b.   A February 6, 1989 felony conviction for possession or purchase for sale of a controlled substance, in violation of Cal. Health and Safety Code section 11351.

c.   On November 28, 1979, Brim was arrested for assault with intent to Murder. He was later exonerated.

d.   On December 29, 1981, Brim was arrested for Murder. He was acquitted at trial.

e.   On February 28, 1988, Brim was arrested for Murder. He was later exonerated.

17.   On July 21, 1993 at approximately 12:45 p.m., I was informed that the employee of J.B. Chemical had received a telephone call from Brim. According to Brim, he was in Reno, and would not be able to pick up the chemicals that day, but that he would be at J.B. Chemical the following day, at about 10:00 a.m.

18.   On July 22, 1993, at about 10:30 a.m., I was conducting surveillance at J.B. Chemical. I observed Brim (whom I recognized from a photograph) and a female passenger arrive in a maroon van, California license plate No. 2ZRN220. Brim went into J.B. Chemical to conduct business. Numerous drums of chemicals were loaded into the maroon van, which then left the location.

11

19. Afterward, I spoke to the employee of J.B. Chemical. He informed me that he had sold Brim 70 gallons of Ethyl Ether, which was loaded in the maroon van. The employee also informed me that Brim requested, and received a case of banana air freshener.

20. According to California Department of Motor Vehicle records, the registered owner of the maroon van is Bryant K. Brim. The VIN of this vehicle is JM3LV5222N0424059.

21. I with other surveillance agents, surveilled the maroon van to a 16760 Multiview Drive, Perris, California. (the Multiview residence). This residence is further described as follows:

> A single story, single family residence, with an attached garage. The exterior of the residence is grey stucco, with blue trim. The residence has a wooden entry door, which faces south. The attached garage extends closer to the sidewalk than the front door. All the windows in the residence are equipped with roll-down metal security gates. There is a barn located on the premises, which is north-west of the residence. There is also a brick wall which extends from the east property line to the west property line, fronting on Multiview Drive. There is a wrought iron gate where the driveway of the residence intersects the brick wall.

12

22. The maroon van pulled into the garage of the Multiview residence, and the garage door was closed behind the maroon van. After about one hour, the maroon van left the location.

23. I and other agents remained in surveillance on the Multiview residence. At 12:30 p.m. on July 24, 1993, I observed a dark blue Chrysler van arrive at the Multiview residence. The van was occupied by a single male black. At approximately five minutes later, the maroon van arrived at the location, occupied by two male blacks. The three men talked for a period of time, and then the three men got into dark blue GMC van that was parked on the property, and left the location. The three men returned at approximately 3:00 p.m. that day. The three men went inside the house. Shortly afterwards, the three men left the house and went into the barn on the property. They returned to the house, and went inside.

24. Approximately ten minutes later, one of the men came outside the house, and began smoking a cigarette. He was later joined by the other two male blacks. I am aware that many of the substances used in the manufacture of PCP, especially ethyl ether, are extremely flammable, making it prudent to smoke cigarettes outside the laboratory.

25. Two of the male blacks got into the maroon van, and left the location. The third male black got into the blue Chrysler van, and backed up to the side entry door to the garage. He unlocked the side door of the garage, and removed two large bundles that were white in color and wrapped in grey

13

masking tape, and, walking very quickly, carried the bundles into the garage. He closed the garage door behind him. The man exited the garage, closing the door behind him. He took two boxes from the van into the garage, and carried two large boxes from the van to the garage.

26. On numerous occasions I have observed kilograms of cocaine. The bundles that the male black carried from the blue Chrysler van into the garage were similar in size, wrapping and appearance to kilograms of cocaine that I have seen in the past.

27. The black male returned to the blue Chrysler van, and carried two blue five gallon containers into the garage. The containers were sealed, and had a white chemical label on them. I was not close enough to the containers to read the chemical notations on the label.

28. The black male then locked up the garage door, and departed the location.

29. SA Brenden D'Arcandelo and I walked up to the fence line of the premises. We both were able to detect a strong odor of banana in the air. We were able to hear motors, similar to the sound of a fan, coming from the garage.

30. In my training and experience, when PCP is manufactured, several chemicals are combined in a bucket. A ten to twelve hour period is required for the chemical reaction to take place. Then other chemicals are added to the mix, and an additional waiting period is required before finished PCP is manufactured.

31. This chemical process gives off strong odors. I believe that the motor I heard was a fan, used to dissipate the chemical vapors. I believe that the banana smell that I detected was from the banana freshener that Brim had purchased at J.B. Chemical. It is common for persons engaged in the manufacture of PCP to use a device of this type to mask the powerful smell of the chemical reactions taking place in the laboratory, to avoid detection.

32. Based on these above facts, I believe that the Multiview residence is being used to manufacture PCP, and that an operating PCP laboratory will be found on those premises.

33. It will be necessary to conduct this search when the suspects return to the Multiview, and before they can remove the finished PCP. Because there is no guarantee that this will not take place at night, it is requested that night time service of this warrant be authorized. In addition, because of the danger of Keith Brim, as established by his criminal history, night time service may be necessary to ensure officer safety.

I swear under penalty of perjury that the foregoing is true and correct.

WILLIAM JACKSON
Southern California Drug
Task Force.

Subscribed and sworn to before me

on this _____ day of July, 1993.

UNITED STATES MAGISTRATE JUDGE

15